The defendant, John W. Peoples, Jr., was indicted by the Talladega County Grand Jury on August 3, 1983, in a five-count capital murder indictment. Count one charged murder of two or more persons, namely, Paul G. Franklin, Sr., and Judy C. Franklin, by one act or pursuant to one scheme or course of conduct, a violation of § 13A-5-40(a)(10), Code of Alabama 1975. Count two charged murder of Paul G. Franklin, Sr., during the kidnapping in the first degree of said person, a violation of § 13A-5-40(a)(1), Code of Alabama 1975. Count three charged murder of Paul G. Franklin, Jr., during the kidnapping in the first degree of said person, a violation of § 13A-5-40(a)(1), Code of Alabama 1975. Count four charged murder during a burglary in the first degree, a violation of § 13A-5-40(a)(4), Code of Alabama 1975. Count five charged murder during a robbery in the first degree, a violation of § 13A-5-40(a)(2), Code of Alabama 1975. *Page 556 
In July 1983, 34-year-old Paul Franklin, Sr., his wife Judy, and their 10-year-old son Paul, Jr., resided near Pell City in St. Clair County. They lived in a house on a peninsula that extends into Lake Logan Martin.
Mr. Franklin owned several personal vehicles between 1980 and 1983, having as many as five at one time, including a red 1968 Chevrolet Corvette. In July 1983, Mr. Franklin had in his employ a tutor for his son, who had been employed for the summer months, and a housekeeper, who came regularly and who had been doing so for three years. Paul Franklin's wife, Judy, scheduled an appointment for 9:00 a.m., July 7, for Paul, Jr., for a session with his tutor. However, the whole family, along with the red Corvette, disappeared from their lake home sometime on the night of Wednesday, July 6, 1983.
Mr. Franklin's mother, with whom he had an extremely close relationship, lives in Birmingham, and the two of them would talk by telephone "every" day. They had such a conversation on July 6, at about 6:30 p.m., and again for five minutes at about 8:30 p.m.
The next morning, July 7, 1983, the housekeeper arrived as arranged and found the house was not locked. When the housekeeper entered the house, she found no one home. She found the lights and the color televisions turned on. The family dog was "laying" in the washroom. She began her housekeeping chores, during which the telephone rang; the call was from Mr. Franklin's mother. This was between 8:30 and 9:00 a.m. After talking with the mother, the housekeeper returned to her duties. While getting the mop and pail, she discovered that Mr. Franklin's Buick Regal was downstairs in the garage. This was unusual, because inside the garage was where the red Corvette was kept "fastened up all the time"; the Buick was normally parked outside. The housekeeper noted a puddle of oil where the Corvette was supposed to be. This observation was "a little after nine o'clock."
After mopping, the housekeeper proceeded with her cleaning. Under the bed in the marital bedroom, she found Mr. Franklin's pants folded in his usual but peculiar manner; however, they still contained his keys, billfold, and money clip. Then she noticed the bed in the guest bedroom was unmade, which was unusual. She began vacuuming when "a voice" told her, "Rosa, get the hell out of here and now," whereupon she "dropped everything right then and there" and left.
Mr. Franklin's mother arrived at the residence about 2:00 o'clock that afternoon, and found no one home and the doors not locked. Mr. Franklin was supposed to have made arrangements for his mother's car to be serviced at a local garage, but when she telephoned the garage from the residence, she found that her son had not made the appointment. Nevertheless, the servicemen did come get her car and service it. Meanwhile, the mother waited at the residence, hoping her son and family would return. Then she began calling family members — her other son in Georgia and Judy Franklin's mother in Birmingham. She also called the sheriff's office.
Judy Franklin's mother arrived at the residence about 7:00 p.m., and a sheriff's deputy arrived a short time later. The mother noticed her daughter's purse on the kitchen bar. She also saw clothes hanging on a dresser; they were the clothes that her daughter had been wearing the previous day. The deputy made a "short investigation," staying there about an hour and a half getting information and determining if anything was missing. Based on this investigation, the deputy put out a police broadcast that the family was missing, and later that night when he obtained a tag number for the missing Corvette, he had a report of the missing car entered in the National Crime Information Center (N.C.I.C.). Paul Franklin's mother and Judy Franklin's mother were instructed to remain in the house until Sunday afternoon, July 10, 1983. When they left, they gave the authorities a house key.
The authorities blocked the driveway to the house on the night of July 8. That night, Officers Marvin Roye and Ed Traylor of the Alabama Bureau of Investigation, and Investigator Owen Harmon, of *Page 557 
the St. Clair Sheriff's Department, continued the investigation at the residence. Officer Roye "spent a great deal of time [that night] with the family going over the family history and information — where would they go and where would they have gone and what their activities were and things of this nature." The officers also looked around and through the house, "looking for things like broken out windows, forced entry, and any kind of destructive type thing." They also checked to see if any family luggage was gone. In the basement where the Corvette was usually parked, Officer Traylor noted an oily shoeprint from a shoe or boot that had a "vibram lug type sole." The two mothers "knew basically where things were, but it was a very difficult task to make some determination if there was anything missing."
On Sunday, July 10, 1983, further investigation at the Franklin residence disclosed the name "John Peoples" written in eyebrow pencil on the top of a clothes hamper in the bathroom. The name was covered by a piece of toilet tissue lying over the name and the end of a towel on a towel rack draped over the clothes hamper. Judy Franklin's mother recognized the handwriting as being Judy's. It was determined that the name had been written there after July 2, 1983. Mr. Franklin's mother then informed the officers that John Peoples was someone she knew and that he had worked for her son around the house. She also told them John Peoples had borrowed money from her son in the past and had lately been trying to borrow more money. She also described him as being a "big robust type fellow, a big man."
The next morning, Monday, July 11, 1983, the officers learned that on the previous Friday, a large man named John Peoples had attempted to sell a red Corvette with a "59 tag" to Regal Pontiac Company in Sylacauga. He was described as being about 6'4" and weighing 240 pounds.
On July 11, 1983, Childersburg Police Chief Ira Finn received a telephone call from a Childersburg druggist concerning a man being at the drug store trying to sell a red Corvette. Chief Finn knew the car was listed "on the N.C.I.C. machine," and when he gave the druggist the tag and registration numbers of the car, the druggist told him that was the car the man at the drug store was trying to sell. Chief Finn notified officers to go to the drug store. Assistant Police Chief Lewis Finn arrived at the drug store at about 1:29 p.m., where he found the appellant and the red Corvette. The officer walked in the drug store and asked Peoples if the car was his, and he replied that it was. Outside, the officer informed the appellant he would have to come to the police station. The appellant was allowed to drive the Corvette to the station while officers followed in a police car.
At the police station, the appellant was taken into Chief Finn's office, and Chief Finn told him the Corvette had been reported stolen from Pell City and that the three family members were missing. The appellant replied, "Well, by god, I didn't steal the car. I've got a bill of sale for it." He then threw a piece of paper on the chief's desk. The chief looked at it without picking it up, and replied, "Well, that ain't too much of a bill of sale. It's not notarized." The appellant responded, "Well, I've got a goddamn tag receipt," and he threw another piece of paper on the desk. He was then told he would have to wait until the arrival of A.B.I. officers, whom Chief Finn had already notified.
Upon receiving the call in Talladega from Chief Finn, St. Clair Deputy Sheriff Owen Harmon and A.B.I. Officer Ed Traylor immediately drove to Childersburg. They arrived at the Childersburg police station around 2:15 p.m., about 20 minutes after the appellant had been brought in. The officers talked to Chief Finn for some 20 to 30 minutes. Chief Finn gave the officers the purported bill of sale. The entire handwritten document reads:
 "I Paul Franklin trade John Peoples one 1968 Corvette for 50 percent ownership of the C.J. Supper Club.
"/s/ Paul G. Franklin
/s/ John W. Peoples
/s/ Judy Franklin *Page 558 
"1946785406573
59A7093 59-5560"
However, the man who actually owned C.J. Supper Club, one Curtis Jackson, came to the police station and told the officers the supper club belonged to him and that the only right, title, or interest the appellant had in the supper club was "operating rights from June the 15th to July the 15th."
The appellant was given a Miranda warning at about 2:45 p.m.; at that point, he had been at the police station about an hour and 15 minutes. He told the officers he understood his rights. While the officers were questioning the appellant, attorney Ray Robbins telephoned. Officer Traylor first talked with the attorney, and the attorney told the officer that the appellant's father had contacted him and "he just called to see what was going on with" the appellant. The appellant then talked to the attorney, and told him that he "didn't need him or an attorney at that time, that [the officers] were talking to him about the car that he had purchased from Paul Franklin, and that if he decided he needed him later he would call him back." After talking with the attorney, the appellant gave the officers a statement in which, apparently, he admitted he and an individual named Timothy Gooden had in fact gone to the Franklin residence on the night of July 6, 1983, in his Toyota pickup truck, but that they left the Franklins at home alive and well about 12:00 or 12:30 that night. Then the officers asked him if he would give them permission to search "his Toyota pickup he was riding in when he went over to Paul Franklin's residence." The officers also asked him for permission to search both his residence in Talladega and the Corvette. He said "that would be fine."
A permission to search form was then read to the appellant, which informed him he had the right to refuse to allow the searches. At approximately 4:30 p.m. on July 11, 1983, he signed the permission to search form. He then left the Childersburg police station with the officers, taking them to his father's residence, where the officers searched his Toyota pickup truck. Nothing was taken from the truck. Next, they went to his apartment in Talladega, where he unlocked the door for the officers. Upon searching the apartment, in a dirty clothes box, the officers found a shirt and a pair of pants that appeared to have bloodstains on them. When the officers found the clothes, the appellant "just slid down the wall and was kind of sitting on his heels." When confronted with the apparent bloodstains, he said they were from barbecue sauce "that he got on there on the 4th of July when he was barbecuing down at the club." However, "at this point, John got very nervous and upset. He started sweating just around the lower part of his chin, sweat was just a-dripping off."
Upon arrival at the St. Clair County Jail in Pell City at 9:00 p.m., on July 11, the appellant was again given aMiranda warning. He also was read a waiver-of-rights form, which he read and signed. He was then interviewed until about 1:30 a.m., at which time the decision was made by the assistant district attorney of St. Clair County to formally place him under arrest for theft by deception of the Corvette. He was wearing "what appeared to be pigskin type boots with a vibram lug type sole," similar to the shoeprint found in the Franklin home. Therefore, before he was locked up for the night, the officers asked him for the boots he was wearing; he took them off and gave them to the officers. The next morning, July 12, Officer Owen Harmon appeared before a magistrate and swore out a theft warrant, which was later read to the appellant. Bond was set at $25,000.
Sometime after the warrant had been read to the appellant on the morning of July 12, he sent a note to the officers requesting that they come and talk to him, that it was "important." Officer Marvin Roy responded and again read him the Miranda warning. The appellant then made a statement to the effect "he could clear this thing up about 90 percent" and that he "could furnish . . . two names." However, he said he wanted to wait until his lawyer arrived before he furnished the information. The attorney, again Ray Robbins, *Page 559 
arrived about noon, and, after talking with the appellant, told the officers that his client "didn't have anything that would help [them]." Routine mugshots and fingerprints were made that afternoon.
The attorney returned the next day, July 13, about noon, to participate in an interview of the appellant's wife. After that interview, a discussion ensued between the attorney and Assistant District Attorney Dennis Abbott. This discussion lasted somewhat less than an hour and was prompted by an earlier request by the appellant that he be allowed to take a polygraph test. Up until this point, his statements were that he had purchased the Corvette from Paul Franklin and had left the Franklins alive and well at about midnight the night of July 6, and that he was not involved in their disappearance.
According to Mr. Abbott, in this discussion the appellant's attorney told him (Abbott) that the appellant "had already told us all that he knew and there might be one or two little things that we didn't already know, but it wouldn't help us any in our investigation." Mr. Abbott then asked the attorney if he would recommend that his client take a polygraph test, which the appellant had previously requested. Based on the appellant's prior statements, Mr. Abbott's offer was that if a polygraph test confirmed that he was being truthful, the appellant could post bond, a preliminary hearing would be set, and, if there were no further incriminatory developments, he would "probably walk" after the preliminary hearing because there would not be sufficient evidence to bind him over to the grand jury. The appellant's attorney then stated that he would recommend that his client take the polygraph test, because he believed his client was telling the truth. This ended that discussion.
At about 5:00 p.m. on July 13, about 30 minutes to an hour after leaving Mr. Abbott, the appellant and his attorney were brought from the county jail to the sheriff's office. The lawyer told Officer Marvin Roy that the appellant had some information to add to his prior statement. Then, in the presence of his attorney and Officers Harmon and Traylor, the appellant stated that the Franklin family was dead. Officer Traylor then asked the appellant if he would take them to the bodies. Mr. Abbott was called to come to the sheriff's office, and when he arrived, Peoples's attorney said, "John Peoples is going to tell ya'll some more. All of them are dead." The appellant then took the police to the bodies of the Franklin family in Talladega County, in a wooded area just off County Road 377.
The officers found lying near the bodies unexpended rounds of .22 caliber rat shot. They also found a gun sight elevator. Mud-grip tire tracks were found leading off the paved road, and a "mashed" path of grass indicated that the body of Paul Franklin, Sr., had been dragged through the grass. Also, the bottoms of the yellow pajamas he was wearing were pulled down around his ankles, consistent with his body having been dragged. Both Judy Franklin and Paul Franklin, Jr., had been blindfolded. The bodies were all in the same stage of advanced decomposition.
The skull of Judy Franklin had been fractured: "There was a large fragmented skull fracture 4 1/2 by 4 inches in diameter. There were ten separate pieces of skull in this area." She had been also shot: "The upper arm near the armpit on the right showed a perforated wound going from this arm through the arm and a few perforations were present in front of her armpit in this area. Went through the robe and skin and soft tissue in this area and minute, very small pellets were recovered from the wound." In the opinion of the pathologist, Judy Franklin died from blunt force trauma due to a blow to the head.
The skull of Paul Franklin, Jr., was also crushed. There was a "large fragmented skull fracture in the back of the left side of the head . . . virtually the entire left side of the head . . . [an] area 6 1/2 by 4." The skull fracture was very similar to the skull fracture of Judy Franklin, and there were approximately 15 fragments in the fractured area. The impact side of the child's skull was a patterned injury. In the pathologist's opinion, the injury to the child's head *Page 560 
was consistent with having been inflicted by the rifle the appellant had shown the two deputies. The pathologist was of the opinion the child died from blunt trauma to the skull.
Based on a hypothetical question involving the circumstances of the disappearance of the Franklin family and the family being found in the woods with two members dead from blunt force injuries to the head, the pathologist was of the opinion that the manner of death of Paul Franklin, Sr., "was not accident or natural or suicide."
On the night of July 14, Talladega County District Attorney Robert Rumsey went to St. Clair County and talked with Mr. Abbott, an assistant district attorney for St. Clair County, and with investigating officers, in an effort to determine in which county venue would be proper. During this discussion, Mr. Rumsey first learned that a polygraph test had been tentatively scheduled for July 15 in Gadsden.
On July 15, 1983, the appellant's attorney brought a document to the St. Clair district attorney's office and asked Mr. Abbott to sign it. Abbott refused to sign the document because it did not accurately reflect their July 13th discussion regarding the polygraph test. Specifically, Abbott said the document was inaccurate because 1) it referred to a discussion of the appellant's taking the authorities "to the bodies and that was never discussed," and 2) it referred to the lawyers' talking about the appellant's making a further statement; however, Mr. Abbott never asked the appellant's attorney to request that the appellant say anything else. Then the appellant's attorney began talking about "going to the polygraph and going ahead and taking it and what was going to happen if he took it and so forth." At this point, although the officers had been taken to the bodies, the appellant had not admitted any involvement in the disappearance or murders of the Franklin family. Mr. Abbott then told Peoples's attorney, "Ray, take him up there and let him take it, and if he passes it, then we'll talk."
Mr. Rumsey arrived in Gadsden at about 2:30 on July 15. He had a 30- to 40-minute discussion with the appellant's attorney concerning the details of giving the appellant a polygraph examination. Toward the end of this discussion, the attorney showed Mr. Rumsey the document purporting to reflect an agreement with Mr. Abbott about the polygraph examination. The appellant's attorney represented to Mr. Rumsey that an agreement such as that reflected in the document had been reached. This was the first Mr. Rumsey had heard about any "agreement." At this point, he told the attorney that any polygraph examination was off until he could enlighten himself about the "agreement" just shown to him.
Mr. Rumsey then telephoned Mr. Abbott, who told him no such agreement had been made; and when defendant's attorney talked to Mr. Abbott on the phone, he said, "You're right, Dennis, this does not correctly state our agreement." When the telephone conversation was over, Mr. Rumsey asked Peoples's attorney if the document correctly stated an agreement with Mr. Abbott, and the answer was, "No." Mr. Rumsey wanted to postpone the polygraph test until he could meet with all persons involved who knew anything about the so-called agreement, but defense counsel began urging that the polygraph test be given that day. Mr. Rumsey relented, and the polygraph test was given that afternoon. At 5:18 p.m., Officer Jimmy Flanagan, a polygraph examiner with the Gadsden Police Department, advised the appellant of his Miranda rights in the presence of the latter's attorney. The appellant signed a waiver-of-rights form, and it was witnessed by his lawyer. The questions to be asked during the polygraph test had been reviewed and approved by Peoples's attorney and by another polygraph examiner retained by the defense. Officer Flanagan had only four questions (termed "relevant questions") he planned to ask regarding the deaths of the Franklin family, all of which called for "yes" or "no" answers. Those questions were: 1) Did you take the Franklin family from their house that night? 2) Did you hit Judy Franklin in the head last week? 3) Were you physically present when Judy Franklin was hit? 4) *Page 561 
Do you know for sure who hit Judy Franklin? When the examiner asked those four questions, the appellant refused to answer any of them. The examiner then terminated the test.
After refusing to take the polygraph test on July 15, the appellant was returned to the St. Clair County Jail. At about 8:30 p.m. on July 19, 1983, he sent the following note to the sheriff of St. Clair County:
 "To whom it may concern I John Peoples are asking to see the sheriff of St. Clair County on the date of July 19, 1983 it is important and he is the only one I will talk to.
Thank you
"/s/ John W. Peoples Jr.
"In reference to case that your working on."
When St. Clair County Sheriff Lewis Brown went to the jail, the appellant indicated he also wanted to talk to Talladega County Sheriff Jerry Studdard. Sheriff Studdard was summoned to the jail.
First, Sheriff Brown told the appellant to call his lawyer and got the number for him. This was between 8:30 and 9:00 p.m. The appellant then placed the call, but was unable to contact his attorney and told the two sheriffs his attorney was not at home. Sheriff Brown then told him to call another attorney, and so he said he wanted to call attorney George Sims. Sheriff Brown then called information and got George Sims' home telephone number. When the appellant was given the number, he said, "Well, that's all right, I don't need a lawyer. I'll just talk to y'all."
At this point, Sheriff Brown began advising the appellant of his Miranda rights. The appellant interrupted, saying, "[Y]ou don't have to read those rights, I've probably had those rights read to me over a thousand times." Nevertheless, Sheriff Brown read the entire warning, then asked again if he wanted to call a lawyer. The appellant answered, "No, I don't want to call a lawyer, I just want to talk to ya'll. I don't want you taping anything or I don't want ya'll writing down any kind of statement, I just want to talk to ya'll." He was asked if he understood his rights, to which he said, "Yes," He was then asked, "Having these rights in mind, do you wish to talk to us now?" He replied, "Yes, I do."
The sheriffs then talked to the appellant and asked him to write a statement. He then wrote out a statement and signed it on a form that contains both a Miranda warning and a waiver of rights. The statement reads: "The case I am in I did do it. Concerning the Franklin family I did do it." After he had written the statement and signed it and it had been witnessed by the sheriffs, he said, "Man, I am glad I told somebody that. It's really a load off my shoulders. I am really glad I told you." The statement was admitted into evidence at trial.
On July 22, 1983, the appellant was removed from St. Clair County and transported to the Talladega County Jail. During the Talladega jail booking procedure, the appellant said to Deputy Terry Brewer, "Terry if you'll get [Deputy] Ricky [Daniels], I'll show ya'll where the gun is." Deputy Brewer got Deputy Daniels, and they took the appellant across the street to an investigator's office, where they met with Sheriff Studdard. He was again given a Miranda warning, and he said he understood his rights and signed the waiver-of-rights form. He also wrote on the form: "I already have a lawyer, but I do not wish to talk to him or have him present with me at this time." He then took the officers "out in the Brecon area" and showed them a gun wrapped in a towel and concealed in some bushes. The gun was bent and broken.
Timothy Gooden, the appellant's third cousin and co-defendant, was interviewed by Dennis Abbott, the assistant district attorney for St. Clair County, on the night of July 11, 1983. (Earlier that day, the appellant had been arrested, and had told the officers that he and Gooden had been at the Franklins' residence.) On July 15, Gooden directed officers to the location where the bodies of the Franklin family had been found two days earlier under the guidance of the appellant. He knew the proper location because he had accompanied the appellant the night of the murder. At trial he *Page 562 
was called by the State, and testified that when he came home from work on Wednesday, July 6, his wife gave him a message from the appellant, so he went to the appellant's house. There Gooden asked the appellant if he was "going to get the car that day." The appellant said, "yes," and he told Gooden he would pick him up "around dark."
About 8:00 or 8:30 p.m., the appellant picked up Gooden in the appellant's Toyota pickup truck which has large mud-grip tires. The two then drove to the Franklin residence. At the Franklin residence, the appellant got out, and Gooden left in the truck and went to a nearby store and bought cigarettes. Gooden then drove back to the Franklin residence and knocked on the door, which was answered by the appellant. Gooden went in and had a seat. The appellant sat at a table with Mr. and Mrs. Franklin "with a bunch of papers on the table with a notebook pad." The appellant got up, asked Gooden to sit there with the Franklins, and he "went to the back of the house." Then he returned accompanied by "the little boy." He asked Mr. Franklin "about selling the car," and Mr. Franklin told him he was going to keep "the car" for the little boy for when he grew up. At this, the appellant "got kind of pissed off about it," and again asked Mr. Franklin to sell him the car. Again, Mr. Franklin declined. He then "went to the back room and when he come back, he had some sheets or towels and a rifle in his hand."
Then the appellant gagged and blindfolded Mrs. Franklin and the boy, and while Gooden watched them, the appellant took Mr. Franklin downstairs. When Gooden heard a commotion downstairs, he started down the stairs with Mrs. Franklin and the boy. At this point, Mrs. Franklin "nudged" Gooden in the side, and when he took her gag off and asked, "What's wrong," she said she wanted to go to the bathroom. Gooden let her go to the upstairs bathroom while he stood at the end of the hall, and when she came out, he took her and the boy back downstairs after replacing her gag and blindfold.
Downstairs, Mr. Franklin was lying on the floor by the pool table in the big family playroom. The appellant then told Gooden to go get the truck and bring it "to the basement door where the Corvette was sitting." While Gooden got the truck, the appellant "got some blankets and stuff and throwed a blanket over the man." The hands of Mrs. Franklin and the boy were then tied, and they were locked in the truck. Gooden and the appellant then "pushed the car out and jumped the car off," and the appellant "put the man in the car with the blanket over him and [appellant and Gooden] left."
According to Gooden, they then "came back to I-20, came back up to 77, come down 77 to Jackson's Trace" and "pulled off in a wooded area." The appellant then dragged Mr. Franklin from the car, dragging him backwards in a "bear hug," and then he came back out of the woods. "John walked up and he got the woman and little boy out of the truck. She started asking John, said, what are you doing. He said it didn't matter, like that. They went down in the woods and the woman was crying and begging John, saying please don't. . . ." Gooden also testified that he heard a gunshot and the woman still screaming, and "a few minutes later, everything got quiet."
When the appellant re-emerged from the woods, he told Gooden "to meet him over there where he used to run a store on 77." The appellant then put the gun and blanket back in the Corvette and left. Gooden complied and later met the appellant at the specified location. The two then returned to the Franklin residence, where the appellant went in and stayed for about 10 or 15 minutes before coming out carrying a telephone and two drinking glasses. The two then returned to the pickup truck. Gooden drove the pickup truck home, and appellant and his wife went to Gooden's home about 2:00 a.m. to get the truck. Appellant showed Gooden some money, which Gooden counted — in excess of $1,100 — and then gave back to appellant. Gooden did not get any of the money, and when Gooden gave appellant the truck keys, the appellant said, *Page 563 
"I'll fix you up later." Gooden "didn't see him no more after that."
 I A
The first issue the appellant raises is that the trial court committed reversible error when it denied him a change of venue. We find that the trial court did not abuse its discretion when it denied the said motion.
 "One of the rights our forefathers fought and suffered for is the United States Constitution's guarantee to all criminal defendants of the right to a trial 'by an impartial jury of the state and district wherein the crime shall have been committed.' U.S. Const. amend. VI. Thus, if an impartial jury, selected from the district wherein the crime was committed, cannot be impaneled, then to refuse the request for a change of venue is a denial of due process of law. Rideau v. Louisiana, 373 U.S. 723, 726 [83 S.Ct. 1417, 1419, 10 L.Ed.2d 663] (1963). See also Groppi v. Wisconsin, 400 U.S. 505 [91 S.Ct. 490, 27 L.Ed.2d 571] (1971). The Constitution of Alabama of 1901 echoes this requirement. See Ala. Const. art. I § 6."
Wilson v. State, 480 So.2d 78, 80 (Ala.Cr.App. 1985). A court does not err by denying a motion for change of venue when the motion merely avers a movant's belief that he cannot receive a fair trial by an impartial jury. Mathis v. State, 280 Ala. 16,189 So.2d 564 (1966), cert. denied, 386 U.S. 935, 87 S.Ct. 963,17 L.Ed.2d 807 (1967); Jackson v. State, 104 Ala. 1, 16 So. 523
(1894); Ellison v. State, 373 So.2d 1247 (Ala.Cr.App. 1979);Sprinkle v. State, 368 So.2d 554 (Ala.Cr.App. 1978), writ quashed, 368 So.2d 565 (Ala. 1979). Instead, the movant has the burden of proving to the reasonable satisfaction of the trial judge that an impartial jury cannot be impaneled. Gilliland v.State, 291 Ala. 89, 277 So.2d 901 (1973); Godau v. State,179 Ala. 27, 60 So.2d 908 (1913); Anderson v. State, 443 So.2d 1364
(Ala.Cr.App. 1983); Coon v. State, 380 So.2d 980
(Ala.Cr.App. 1979), aff'd, 380 So.2d 990 (Ala.), vacated,449 U.S. 810, 101 S.Ct. 58, 66 L.Ed.2d 14 (1980), rev'd per curiam on remand on other grounds, 405 So.2d 704 (Ala.Cr.App. 1981). There are two ways in which the movant can meet this burden of proof: 1) by showing that there has been pervasive, inherently prejudicial publicity which has so saturated the community as to have a probable impact upon prospective jurors, see e.g.,Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 507, 16 L.Ed.2d 600
(1966); Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628,14 L.Ed.2d 543 (1965); Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417,10 L.Ed.2d 663 (1963); and Wilson v. State, 480 So.2d 78
(Ala.Cr.App. 1985); or 2) by showing that there has been extensive publicity that has caused actual jury prejudice.Jackson v. State, [Ms. 6 Div. 767, April 9, 1985] (Ala.Cr.App.), cert. granted, No. 84-1112 (Ala. Aug. 27, 1985);Duncan v. State, 436 So.2d 883 (Ala.Cr.App. 1983); Hopkins v.State, 429 So.2d 1146 (Ala.Cr.App. 1983); Dolvin v. State,391 So.2d 666 (Ala.Cr.App. 1979), aff'd, 391 So.2d 677 (Ala. 1980).
The fact that there was widespread publicity is not sufficient to require a change of venue. Thomas v. State,452 So.2d 899 (Ala.Cr.App. 1984); Sparks v. State, 450 So.2d 188
(Ala.Cr.App. 1984); Crowe v. State, 435 So.2d 1371
(Ala.Cr.App. 1983); Magwood v. State, 426 So.2d 918
(Ala.Cr.App. 1982), aff'd, 426 So.2d 929 (Ala.), cert. denied,462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1355 (1983). Nor must a qualified juror be totally ignorant of the facts in the case.Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344
(1977); Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031,44 L.Ed.2d 589 (1975); Jackson v. State, [Ms. 6 Div. 767, April 6, 1985] ___ So.2d ___ (Ala.Cr.App.), cert. granted, No. 84-1112 (Ala. Aug. 27, 1985); Lokos v. State, 434 So.2d 818
(Ala.Cr.App. 1982), aff'd, 434 So.2d 831 (Ala. 1983).
The appellant presented affidavits attesting to the belief that he could not receive a fair trial in Talladega County. The State countered with affidavits to the contrary. Newspaper articles were admitted into evidence to show pre-trial publicity. The articles are objective and use the seemingly, non-accusatory journalistic phraseology of "reportedly," "allegedly," "according to," etc. The articles do not contain inherently prejudicial information. All seventy-nine *Page 564 
veniremen had either read or heard about the incident; however, only eight had fixed opinions regarding the appellant's guilt or innocence. Those eight were stricken for cause. The appellant did not prove actual prejudice on the part of any of the remaining veniremen.
After an independent review of the record, § 15-2-20(b), Code of Alabama 1975, we do not find that there was "a trial atmosphere that had been utterly corrupted by press coverage."Murphy v. Florida, 421 U.S. 794, 798, 95 S.Ct. 2031, 2035,44 L.Ed.2d 589 (1975). The trial judge did not abuse his discretion by denying the motion for change of venue.
 B
The appellant contends that the court erred in not striking for cause venireman number 17, Mr. Jimmy Chastain. During voir dire questioning by appellant's counsel, Mr. Chastain made known the fact that he was a reserve deputy sheriff in Talladega County. After a noon recess the following occurred:
 "THE COURT: Tell them to hold the jury before they come in here and we'll take up these challenges and get them out of the way.
 "MR. SHORT: Judge, for the record, Juror Number 17, Mr. Jimmy Chastain, is a reserve deputy; and we have indicated to the Court that he rode with Sheriff Studdard with the bodies of the victims in this car, where it was located, and was present at that time. Based on his knowledge of the law enforcement in this case, we challenge Mr. Chastain for cause. We think his knowledge would be too intimate from a law enforcement point of view for him to be a fair and impartial juror. We challenge Mr. Chastain.
"THE COURT: Anything from the State?
 "MR. RUMSEY: There's nothing in that challenge. If he thinks his view would be too impartial [sic], he never did ask him any questions about it, and all the questions he responded to was that he could render a fair and impartial verdict based upon the law and the evidence. The fact that he rode out there to the scene with the Sheriff — who — there's no evidence the Defendant was at the scene or anything else. That and that alone — in fact there's not even a question pondered to him by Mr. Short after he made that known.
 "MR. SHORT: Judge, I didn't ask him any questions because the court reporter wasn't here at that time.
 "THE COURT: What I'll do, I think we ought to let you ask some more questions before I make a decision, and I will let you do that sometime this afternoon.
"MR. SHORT: All right, sir."
During the remainder of the voir dire, approximately 125 pages in the record, appellant's attorney did not again question Mr. Chastain. Nevertheless, at the conclusion of the voir dire, appellant's counsel again challenged Mr. Chastain for cause.
 "THE COURT: Let's finish these up before we move on. You challenged . . . James Chastain.
"MR. SHORT: Yes, sir.
"THE COURT: Panel number one.
 "MR. RUMSEY: Judge, Mr. Chastain just said he rode out there with the Sheriff. That's all. He came up and made that known. Mr. Short never asked him any questions, and he had the panel back in there with one and two.
 "MR. SHORT: Judge, we didn't ask him any questions because at the time he disclosed that the court reporter was not present.
 "MR. RUMSEY: Certainly the court reporter was present when Panels one and two came back in there in bulk.
 "MR. SHORT: I think that participation, Judge, by being involved in the investigation in and of itself is grounds for challenge.
 "MR. RUMSEY: Judge, my point is this. There's no testimony before the Court he's involved in any investigation. He just said he rode out there with the Sheriff.
 "THE COURT: He testified he could render a decision based on the law and the evidence. I wrote that down. I'm going *Page 565 
to deny that challenge by the Defendant"
During jury selection, the appellant used his first strike to remove Mr. Chastain from the jury panel.
Two facts support appellant's contention: 1) Mr. Chastain's statement that he was a reserve deputy, and 2) that he rode with the sheriff to where the bodies were found. Appellant's assertions that Mr. Chastain helped transport the bodies and aided in the investigation are not supported by the record. An appellate court will not presume error from a silent record regarding the lack of qualifications of a venireman.Gilbert v. State, 401 So.2d 342 (Ala.Cr.App. 1981). The court did not err in denying this challenge for cause.
 II
The appellant contends that during jury selection the district attorney improperly referred to the possibility that the appellant might not testify. In response to questioning by appellant's attorney of jury panel number three, a juror stated she had a fixed opinion "as to his character from what I heard." Thereafter, the district attorney questioned the prospective juror as follows:
 "MR. RUMSEY: Mrs. Ryan, when you say that you have a fixed opinion as to things that you have heard about the Defendant, I'll just simply ask you this — is that in any way connected with this case?
"JUROR RYAN: No.
 "MR. RUMSEY: So, it in no way touches this case whatsoever.
"JUROR RYAN: No.
 "MR. RUMSEY: If the Defendant did not testify in this case, I'll just ask you if you could follow the Judge's —
 "MR. SHORT: Judge, we object and ask for a conference with the Court outside the presence of the jurors as to that question.
"MR. RUMSEY: Okay. I'll withdraw the question.
 "MR. SHORT: I don't think you can withdraw that question.
 "THE COURT: Do you want to move to withdraw the question?
 "MR. RUMSEY: Yes, sir. I moved to withdraw the question."
Appellant's attorney then made a timely motion for a mistrial, to which the district attorney responded as follows:
 "MR. RUMSEY: Judge, my suggestion is get the six in here. Ask them if they can disregard it. If they can — if they can't strike them off the panel. There were only six in here when it was said. Just strike them off the panel. We've got plenty of people. We've only got to have thirty four people to strike from — thirty-six — just strike them off. Most of them are challenged for cause any way.
 "THE COURT: Let's go ahead. I'll reserve a ruling on that for right now.
". . .
 "MR. RUMSEY: Judge, we need to get those other six jurors in here and get that straightened out."
The seven veniremen who were in the courtroom when the district attorney made the comment were then brought back into the courtroom and instructed to disregard the comment; the trial judge gave the veniremen the usual jury charge regarding a defendant's right not to testify. The panel was then polled, and each venireman stated they could disregard the district attorney's comment. There is a prima facie presumption against error when a trial judge promptly charges the jury to disregard improper remarks. Henry v. State, 468 So.2d 896
(Ala.Cr.App. 1984), cert. denied, 468 So.2d 902 (Ala. 1985);Mallory v. State 437 So.2d 595 (Ala.Cr.App. 1983); Elmore v.State, 414 So.2d 175 (Ala.Cr.App. 1982); Kelley v. State,405 So.2d 728 (Ala.Cr.App.), cert. denied, 405 So.2d 731
(Ala. 1981). Nevertheless, of the seven veniremen who heard the statement, six were subsequently stricken for cause, leaving only one who was stricken with a peremptory strike.
 III
When the appellant was arrested in Childersburg, the Corvette he was driving was impounded and searched, and photographs were taken of blood stains found therein. A purported bill of sale for the *Page 566 
Corvette was kept by the police, as were the boots the appellant was wearing. Additionally, the police seized a pair of blue jeans with blood stains on them during a search of the appellant's apartment. The appellant contends that each of these items should not have been admitted into evidence at his trial because they were the fruit of an illegal arrest; because police officers did not have probable cause to arrest, he argues, everything flowing from the arrest is tainted and, therefore, inadmissible as being "fruit of the poisonous tree."Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407,9 L.Ed.2d 441 (1963).
"[A]ll evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court." Mapp v. Ohio, 367 U.S. 643,655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081 (1961). Although the application of the exclusionary rule via the fruit-of-the-poisonous-tree doctrine, to exclude evidence obtained following an unconstitutional arrest, usually involves confessions — see, e.g., Taylor v. Alabama, 457 U.S. 687,102 S.Ct. 2664, 73 L.Ed.2d 314 (1982), Dunaway v. New York,442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), Brown v.Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) — tangible forms of evidence whose trustworthiness is beyond question are subject to such exclusion.
 "Our decisions recognize no exception to the rule that illegally seized evidence is inadmissible at trial, however relevant and trustworthy the seized evidence may be as an item of proof. The exclusionary rule was fashioned as a sanction to redress and deter overreaching governmental conduct prohibited by the Fourth Amendment. To make an exception for illegally seized evidence which is trustworthy would fatally undermine these purposes."
Davis v. Mississippi, 394 U.S. 721, 724, 89 S.Ct. 1394,22 L.Ed.2d 676 (1969). The court went further and quoted with approval the following from Bynum v. United States, 104 U.S.App.D.C. 368, 370, 262 F.2d 465, 467 (1958):
 " 'True, fingerprints can be distinguished from statements given during detention. They can also be distinguished from articles taken from a prisoner's possession. Both similarities and differences of each type of evidence to and from the others are apparent. But all three have the decisive common characteristic of being something of evidentiary value which the public authorities have caused an arrested person to yield to them during illegal detention. If one such product of illegal detention is proscribed, by the same token all should be proscribed.' "
Davis v. Mississippi, 394 U.S. at 724, 89 S.Ct. at 1396. (Emphasis added.) Therefore, if the seminal arrest was in contravention of the Constitution, then all derivative evidence not otherwise obtainable must be suppressed. "The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all."Silverthorne Lumber Company, Inc. v. United States,251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920). A contrary holding would be "reduc[ing] the Fourth Amendment to a form of words." Id.
The appellant does not contest the admissibility of the items on any grounds other than the allegedly improper arrest. Nevertheless, due to Rule 45A, A.R.A.P., we will address each item individually.
The bill of sale was obtained when the appellant was brought into the Childersburg Police Department and told the car had been reported as stolen. The appellant responded by throwing onto a desk a purported bill of sale, and then what he claimed to be a tag receipt. Therefore, the documents were voluntarily produced and thus admissible so long as they were not produced pursuant to an illegal arrest.
The bloodstained blue jeans were seized during a search of the appellant's bedroom. The appellant executed a consent-to-search form and accompanied the officers to his apartment, unlocking the door for them. The appellant does not contend that the consent was improperly obtained. Nevertheless, we have reviewed the transcript *Page 567 
which indicates that the consent was voluntarily, intelligently, and knowingly given; there is no indication that the appellant did not understand that he had the right not to consent to the search, nor is there any evidence of coercion in obtaining the consent.
 "However, a finding that the defendant's consent to search was voluntarily given is but one step in the determination of the propriety of the search, because even if the consent were voluntary it still may have been obtained by the exploitation of an illegal arrest. . . . Although in situations involving consent, voluntariness is not examined in light of the fifth amendment, as it is in confession cases, such a distinction is beside the point. What is of concern is whether some inculpatory action by an arrestee, albeit voluntary, was obtained by the exploitation of an illegal arrest by a police officer, which as a consequence violates the constitutional safeguards of the fourth amendment so as to require application of the exclusionary rule. The inculpatory action on the part of the arrestee can take the form of a consent to search just as easily as it can a confession, and for purposes of the fourth amendment there is no substantive difference between the two."
People v. Odom, 83 Ill. App.3d 1022, 39 Ill.Dec. 406, 411,404 N.E.2d 997, 1002 (1980). Notwithstanding our finding of voluntariness, if the arrest preceding the consent to search was invalid, and the consent to search was obtained as a direct and immediate result of the arrest, then it, too, would be invalid.
St. Clair Deputy Harmon and A.B.I. Officer Traylor had been in the Franklins' residence, and the latter noticed an oily shoe print from a shoe or boot that had a vibram lug type sole. When the officers arrived in Childersburg in response to Chief Finn's call, they saw that the appellant was wearing boots with a vibram lug type sole. Therefore, before the appellant was locked up for the night, the officers asked him for his boots.
If the initial arrest was lawful, then the seizure of the boots was justified as a seizure incident to a lawful arrest.
 "A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment."
United States v. Robinson, 414 U.S. 218, 235, 94 S.Ct. 467,476, 38 L.Ed.2d 427 (1973). "It is also plain that searches and seizures that could be made on the spot at the time of the arrest may legally be conducted later when the accused arrives at the place of detention." United States v. Edwards,415 U.S. 800, 803, 94 S.Ct. 1234, 1237, 39 L.Ed.2d 771 (1974). The boots were being seized, quite naturally, for the purpose of comparing them with the prints found inside the Franklins' home. "Nor is there any doubt that clothing or other belongings may be seized upon arrival of the accused at the place of detention and later subjected to laboratory analysis or that the test results are admissible at trial." Id., at 803-04,94 S.Ct. at 1237.
Additionally, the seizure of the boots was justified because of the appellant's status as a "prisoner"; "A detainee simply does not possess the full range of freedoms of an unincarcerated individual." Bell v. Wolfish, 441 U.S. 520, 546,99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979).
 "Notwithstanding our caution in approaching claims that the Fourth Amendment is inapplicable in a given context, we hold that society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell and that, accordingly, the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell. The recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the *Page 568 
concept of incarceration and the needs and objectives of penal institutions."
Hudson v. Palmer, 468 U.S. 517, 104 S.Ct. 3194, 3200,82 L.Ed.2d 393 (1984). Nevertheless, "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." Bell v. Wolfish,441 U.S. at 545, 99 S.Ct. at 1877. See, e.g., Pell v. Procunier,417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974) (freedom of speech and religion); Lee v. Washington, 390 U.S. 333,88 S.Ct. 994, 19 L.Ed.2d 1212 (1968) (racially invidious discrimination); Wolff v. McDonnell, 418 U.S. 539,94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (no deprivation of life, liberty, or property without due process of law); Johnson v. Avery,393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969) (reasonable access to the courts); Estelle v. Gamble, 429 U.S. 97,97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (cruel and unusual punishment). "Afortiori, pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that we have held are enjoyed by convicted prisoners." Bell v. Wolfish,441 U.S. at 545, 99 S.Ct. at 1877. Consequently, even if a detainee has no expectation of privacy in his cell, if his initial arrest is invalid, then any derivative evidence is inadmissible.
The police seized the Corvette and took pictures of bloodstains observed inside the car. The State contends that because the vehicle was stolen property, the appellant lacks standing to contest the search and seizure.
Whether a person has standing to contest the constitutionality of a search and seizure depends on whether that person has a reasonable expectation of privacy in the item(s) searched and/or seized. United States v. Salvucci,448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), Rakas v.Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). A general rule has developed, stating that a person's interest in his or her possession of stolen property is not a legitimate
expectation of privacy society is willing to recognize as reasonable. See Brown v. United States, 411 U.S. 223,93 S.Ct. 1565, 36 L.Ed.2d 208 (1973) (fn. 4: Defendant's interest was "totally illegitimate"); United States v. Hensel, 672 F.2d 578
(6th Cir.), cert. denied, 457 U.S. 1107, 102 S.Ct. 2907,73 L.Ed.2d 1316 (1982); United States v. Hargrove, 647 F.2d 411
(4th Cir. 1979); Smith v. Garrett, 586 F. Supp. 517
(D.C.W.Va. 1984); McMillian v. State, 65 Md. App. 21,499 A.2d 192 (1985); People v. Mercado, 114 A.D.2d 377, 493 N.Y.S.2d 896
(1985); Sanborn v. State, 251 Ga. 169, 304 S.E.2d 377 (1983);State v. Hamm, 348 A.2d 268 (Me. 1975). See generally W. LaFave, 3 Search and Seizure § 11.3 (1978). Alabama follows this general rule. See, Nelson v. State, 405 So.2d 392
(Ala.Crim.App. 1980), rev'd on other grounds — Beck v. State,396 So.2d 645 (Ala. 1980) — 405 So.2d 401 (Ala. 1981). Some states, however, do not follow this general rule. E.g., People v.Smith, 118 Mich. App. 366, 325 N.W.2d 429 (1982), State v.Settle, 122 N.H. 214, 447 A.2d 1284 (1982).
This general rule appears to dispose of the appellant's contention regarding the search and seizure of the Corvette. However, simply possessing stolen property is not tantamount to a loss of all Fourth Amendment rights; even though a person does not have standing to contest the search of stolen goods — because his expectation of privacy is not reasonable — if the search was rendered possible because of a preceding unlawful arrest, the fruits of the search are tainted and thus inadmissible at trial. "[T]he wrongful possession does not vitiate standing that the thief otherwise has. Accordingly, he is still entitled to challenged unlawful interference with his person and thus challenge a search of the car as the fruit of an illegal arrest." People v. Gittens, 110 A.D.2d 908,488 N.Y.S.2d 457, 458 (1985). Accord, Sanborn v. State,251 Ga. 169, 304 S.E.2d 377 (1983); W. LaFave J. Israel, 1 CriminalProcedure § 9.1(d) (1984).
 "[U]nquestionably he has standing to bring into issue the lawfulness of his arrest if, for example, incriminating evidence was thereafter found on his person in a search incident to that arrest. This being so, a thief arrested in a stolen car would seem to have a much better chance of establishing standing regarding a search of the car if he presents his *Page 569 
claim on the theory that the car search was a 'fruit of the poisonous tree' of the prior illegal seizure of his person, than if he is only able to question the legality of the car search standing alone."
W. LaFave, 3 Search and Seizure § 11.3(e), at 574 (1978). Seealso, Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407,9 L.Ed.2d 441 (1963) (narcotics inadmissible, even though seized from premises where defendant had no Fourth Amendment interest, because their discovery was the result of an illegal arrest). Therefore, the admissibility of the fruits of the search of the car, as well as its seizure, and likewise the admissibility of the other items of evidence, is dependent upon the validity of the arrest.
When the appellant was confronted at a store in Childersburg and asked if the Corvette was his, the officers knew that the car matched the one listed with N.C.I.C. as being stolen. They asked the appellant to accompany them to the police station to answer some questions about the car. He agreed, and voluntarily drove the car to the station. He was told that he was not under arrest. He produced the purported bill of sale, and shortly thereafter, the police learned that it was fraudulent; the appellant supposedly gave as consideration for the car, ownership in a supper club which the appellant did not own. Additionally, the appellant talked to an attorney and told him that his services were not needed, that the police were simply checking out the car. The appellant voluntarily consented to the search of his apartment, wherein the blood stained blue jeans were found. Thereafter, the appellant was arrested. We find that there was probable cause for the arrest. We do not agree with the appellant that the arrest occurred when he was confronted in the store in Childersburg. Therefore, the above items of evidence were not inadmissible as fruit of the poisonous tree.
 IV
On July 13, 1983, two days after the appellant's arrest, his defense counsel confronted the assistant district attorney about the possibility of the appellant's taking a polygraph test. (To this point, the appellant was under arrest for theft by deception of the automobile, and the investigation into the disappearance of the Franklin family was continuing. On July 12, he had told the officers that he had left the Franklin residence while they were alive and well.) Ultimately, an agreement was reached that the appellant would make a statement telling everything he knew about the case; that he would lead the police to the evidence about which he knew; that he would take a polygraph test regarding the disappearance of the Franklins; and, that if he passed the test, indicating that he was not involved in their disappearance, then the bond on his theft charge would be reduced and murder charges would not be filed against him. The appellant gave a statement and led the police to the Franklins' bodies. However, the appellant refused to answer the four "relevant" questions during the subsequent polygraph examination.
The appellant contends that the statement, and the concomitant discovery of the bodies as a "fruit" of the statement, were not voluntary, but were the product of an improper inducement to get him to incriminate himself — that they were the result "of a promise made to him through his attorney." (Appellant's brief p. 72.) That issue need not be decided, because the statement was not used at trial, and the discovery of the bodies would have been discovered by the police through an independent source.
On the day of the appellant's arrest, he told the police that his cousin, Timothy Gooden, had been with him at the Franklin residence when he bought the Corvette. Mr. Gooden was, therefore, questioned by the prosecutor that night. On July 15, two days after the appellant had led the police to the bodies, Mr. Gooden, based on his own knowledge of the location, led the police to the same location.
We find that Mr. Gooden's assistance was an independent source as contemplated by that doctrine. "[O]ur cases make clear that evidence will not be excluded as 'fruit' unless the illegality is at least the 'but for' cause of the discovery of the evidence." *Page 570 Segura v. United States, 468 U.S. 796, 104 S.Ct. 3380, 3391,82 L.Ed.2d 599 (1984). Even if evidence is acquired improperly, that "does not mean that the facts thus obtained become sacred and inacessible. If knowledge of them is gained from an independent source they may be proved like any others. . . ."Silverthorne Lumber Company, Inc. v. United States,251 U.S. at 392, 40 S.Ct. at 183. Our prior determination that the appellant's arrest was based on probable cause dispensed with the appellant's claim that the independent source doctrine is inapplicable.
 V
The appellant contends that his July 19 confession was inadmissible because he did not voluntarily waive his right to counsel. While in jail on July 19, four days after refusing to answer the four "relevant" questions during the polygraph examination, the appellant sent a note to the sheriff saying he wanted to talk. The sheriff told the appellant to call his lawyer. The lawyer was not home, so the sheriff asked the appellant whether there was another lawyer to whom the appellant would talk. Before a second lawyer was called, the appellant said, "I don't need a lawyer. I'll just talk to y'all." The sheriff advised the appellant about his entireMiranda rights, even though the appellant had interrupted, saying he knew them. When again asked if he wanted to call a lawyer, the appellant said "No, I don't want to call a lawyer, I just want to talk to y'all." He then admitted to killing the Franklins, and said that he was relieved to tell the officers.
"[A]n accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communications, exchanges, or conversations with the police."Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880,1884-85, 68 L.Ed.2d 378 (1981). It is clear that the appellant, not the police, was the one who initiated the conversation on July 19. It is also clear that the police knew the appellant had counsel and attempted to respect that relationship by trying to call that attorney before agreeing to talk to the appellant. The appellant voluntarily, knowingly, and intelligently waived his right to counsel. Miranda v. Arizona,384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). "The fact that a defendant has an attorney does not mean, as a per se
rule, that law enforcement officials cannot procure a statement of any kind from the defendant without prior notice to, and the consent of, his attorneys." Nelson v. State, 398 So.2d 421, 425
(Ala.Cr.App. 1981). See also, Chandler v. State, 426 So.2d 477
(Ala.Cr.App. 1982); Payne v. State, 424 So.2d 722
(Ala.Cr.App. 1982); Thompson v. State, 347 So.2d 1371
(Ala.Cr.App.), cert. denied, 347 So.2d 1377 (Ala. 1977).
This appeal does not involve an ex parte questioning of the appellant in violation of his Sixth Amendment right to counsel.See Maine v. Moulton, 474 U.S. 159, 106 S.Ct. 477,88 L.Ed.2d 481 (1985); United States v. Henry, 447 U.S. 264,100 S.Ct. 2183, 65 L.Ed.2d 115 (1980); Massiah v. United States,377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). This is because formal criminal procedures had not yet commenced; the Sixth Amendment right to counsel does not attach until indictment, or preliminary hearing if one is held. Coleman v. Alabama,399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970).
 VI
The State presented evidence that blood found on the rifle was type "O." The State then introduced a ten-year-old medical record from Judy Franklin's obstetrical records to prove that her blood was type "O." The appellant claims that the medical record was inadmissible because the State did not prove that the typed blood sample actually came from Judy Franklin, and that a proper chain of custody of the blood sample was not proven. He cites Whetstone v. State, 407 So.2d 854
(Ala.Cr.App. 1981). We do not agree with the appellant's contention.
 VII
The appellant claims that the jailers seized a tape recorder provided to him by *Page 571 
his counsel "for the purpose of dictating notes and messages." He contends that the seizure violated his Sixth Amendment right to counsel.
During a visit with the appellant, his mother gave him a micro-cassette tape recorder provided by defense counsel. When the appellant was being searched after the visit, he emptied his pockets, except for the pocket where the recorder was concealed. The officers told him to remove the item, but the appellant attempted to run. He was caught and the tape recorder was seized. It was searched and returned to the appellant after about ten minutes.
"Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel. . . ."Bell v. Wolfish, 441 U.S. at 547, 99 S.Ct. at 1878. "The curtailment of certain rights is necessary, as a practical matter, to accommodate a myriad of 'institutional needs and objectives' of prison facilities, . . . chief among which is internal security." Hudson v. Palmer, 104 S.Ct. at 3199. The fact that at the time of the seizure the appellant was a pre-trial detainee, as opposed to a convicted prisoner, is immaterial. "Indeed, it may be that in certain circumstances they present a greater risk to jail security and order." Bellv. Wolfish, 441 U.S. at 546, fn. 28, 99 S.Ct. at 1878, fn. 28. "[C]entral to all other corrections goals is the institutional consideration of internal security within the correctional facilities themselves." Pell v. Procunier, 417 U.S. at 817,94 S.Ct. at 2800. Therefore, the seizure, and immediate return, of the tape recorder did not violate the appellant's right to counsel.
 VIII
The trial judge instructed the jury regarding the appellant's right not to testify:
 "We have a code section that provides that on the trial of all indictments, complaints, or other criminal proceedings the person on trial shall at his own request but not otherwise be a competent witness, and his failure to make such request shall not create any presumption against him nor be the subject of comment by counsel. This statute is to the effect that the Defendant may elect not to testify, and if he does so elect, his failure to testify in his own behalf shall not create any presumption against him. This gives the Defendant a substantive right which you under your oaths are bound to respect and uphold. The statute means exactly what it says, and it would be highly improper and unjust for a jury to disregard this statute in arriving at your verdict."
The statute to which the trial judge referred is § 12-21-220, Code of Alabama 1975, which is based on Ala. Const. Art. I, § 8. Whitt v. State, 370 So.2d 736 (Ala. 1979).
The appellant neither requested nor objected to the above instruction, and he now claims that the court erred by giving the instruction. Even if he had objected, the giving of the charge would not have been reversible error, Tucker v. State,429 So.2d 1165 (Ala.Cr.App. 1983). The failure to give such a charge when requested may be reversible error if the substance of the charge is not covered in the court's oral charge. Perryv. State, 368 So.2d 310 (Ala. 1979); Jordan v. State,392 So.2d 1230 (Ala.Cr.App. 1980), cert. denied, 392 So.2d 1233
(Ala. 1981). We find nothing wrong with the above instruction.
 IX
The appellant presented character witnesses during the sentencing hearing. The State cross-examined those witnesses, testing their credibility by asking if they knew about the appellant's involvement in several other car thefts and many worthless check charges. Such was proper cross-examination.Frazier v. State, 56 Ala. App. 166, 320 So.2d 99 (1975). See C. Gamble, McElroy's Alabama Evidence § 27.01 (3rd ed. 1977).
 X
As required by § 13A-5-53(a), Code of Alabama 1975, this court now reviews the propriety of the imposition of the death penalty in this case. Our review must include a determination of the following questions:
 (1) Was any error adversely affecting the rights of the defendant made in the sentence proceedings? *Page 572 
 (2) Were the trial court's findings concerning the aggravating and mitigating circumstances supported by the evidence?
 (3) Was the death penalty the proper sentence in this case?
As to the first question, we have reviewed the sentence proceedings and have found no error adversely affecting the appellant's rights. As to the second question, we have reviewed the record and are satisfied that the trial court's written findings concerning the aggravating and mitigating circumstances are fully supported by the evidence. See attached appendix.
To answer the third question of whether the death penalty was properly imposed in this case, we must determine:
 (1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;
 (2) Whether an independent weighing of the aggravating and mitigating circumstances at the appellate level indicates that death was the proper sentence; and
 (3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
Alabama Code (1975), § 13A-5-53(b). See also, Beck v. State,396 So.2d 645 (Ala. 1981).
There is nothing in the record before us which even intimates that the death penalty was imposed under the influence of passion, prejudice, or any other arbitrary factor.
Our independent weighing of the aggravating and mitigating circumstances leaves us with no doubt that the death penalty is appropriate in this case; we agree with the trial judge that the aggravating circumstances outweigh the mitigating circumstances. The sole mitigating circumstance is that the appellant "has no significant history of prior criminal activity." Ala. Code (1975), § 13A-5-51(1). We agree with the trial judge's determination that that mitigating circumstance is outweighed by the applicable aggravating circumstances, to-wit: 1) "The capital offense was committed while the appellant was engaged or was an accomplice in the commission of . . . or flight after committing . . . robbery." Ala. Code (1975), § 13A-5-49(4); and 2) "The capital offense was especially heinous, atrocious or cruel compared to other capital offenses." Ala. Code (1975), § 13A-5-49(8).
In regard to the final determination this court must make, we find that the death penalty imposed on the defendant is not excessive or disproportionate to the penalty imposed in similar cases. See, e.g., Thomas v. State, 460 So.2d 207
(Ala.Cr.App. 1983), aff'd, 460 So.2d 216 (Ala. 1984); Horsley v.State, 374 So.2d 363 (Ala.Cr.App. 1978), aff'd, 374 So.2d 375
(Ala. 1979), vacated and remanded on other grounds,448 U.S. 903, 100 S.Ct. 3043, 65 L.Ed.2d 1133 (1980); Williamson v.State, 370 So.2d 1054 (Ala.Cr.App. 1978), aff'd, 370 So.2d 1066
(Ala. 1979), vacated and remanded on other grounds,448 U.S. 903, 100 S.Ct. 3042, 65 L.Ed.2d 1132 (1980).
We have searched the record as required by Rule 45A, A.R.A.P., and have found no error which adversely affected the rights of the appellant. The sentence of death was proper in this case. Therefore, the judgment of the trial court is due to be, and it is hereby, affirmed.
AFFIRMED.
All the Judges concur, except BOWEN, P.J., who concurs in result only.
 APPENDIX STATE OF ALABAMA, PLAINTIFF, VS: JOHN W. PEOPLES, JR., DEFENDANT.
 CRIMINAL ACTION # CC-83-272 IN THE CIRCUIT COURT FOR THE TWENTY-NINTH JUDICIAL CIRCUIT OF ALABAMA
TALLADEGA COUNTY, ALABAMA
 FINDINGS OF FACT IN REGARD TO THE PUNISHMENT PHASE OF THE TRIAL
The State proved beyond a reasonable doubt and to a moral certainty that the *Page 573 
defendant committed murder during a robbery in the first degree, or an attempt thereof, committed by the defendant, and murder by the defendant during a burglary in the first degree, or an attempt thereof committed by the defendant, and murder by the defendant during a kidnapping in the first degree, or an attempt thereof committed by the defendant and the Court so finds. The State had proven the defendant guilty of 4 provisions of the Capital punishment offenses as set out in Section 13A-5-40, being murder by the defendant during a robbery in the first degree, or an attempt thereof, committed by the defendant, murder by the defendant during a burglary in the first degree, or an attempt thereof, committed by the defendant, murder by the defendant during a kidnapping in the first degree or an attempt thereof, committed by the defendant and murder of two people by the defendant by one act or pursuant to one scheme or course of conduct.
The defendant offered little evidence of mitigating circumstances as provided in Sections 13A-5-51 nor 13A-5-52. At the conclusion of the sentence hearing the jury returned a verdict recommending that the defendant be punished by death. The vote was 11 for death and 1 for life without parole.
The Court finds that the conduct of the defendant constituted a brutal, aggravated, merciless, and intentional killing of a man, his wife, and their 10 year old child, and that the recommendation of the jury as to the punishment to be imposed was fully justified by the facts and circumstances of the case and the aggravating circumstances outweighed the mitigating circumstances proved by the defendant.
The Court further finds that the sentence of death was not recommended by the jury under influence of passion, prejudice, or any arbitrary factor. The Court finds that the defendant and the victims, Paul Franklin, Sr. and Paul Franklin, Jr., were male caucasians, and the victim Judy Franklin, was a female caucasian. The Court further taking judicial knowledge of the proceedings conducted before it finds that the composition of the jury trying the defendant in this case was as follows: two white males, eight white females, one black male, and one black female.
Done this 27th day of January 1984.
 s/Jerry L. Fielding JERRY L. FIELDING CIRCUIT JUDGE
CONSIDERATION, FINDINGS AND DETERMINATION OF SENTENCE AS REQUIRED BY SECTION 13A-5-47(b)
As required by Section 13A-5-47(b), the Court ordered and received a written presentence and investigation report consisting of some ten (10) pages, which is ordered to be included in the record of this case. Copies of the presentence report were furnished to both the attorneys for the defendant and the District Attorney. The Court has carefully read, studied and considered the presentence report before arriving at the final decision determining the sentence herein.
The Court finds under Section 13A-5-49 as follows:
1. The Capital offense was not committed by a person under sentence of imprisonment;
2. The defendant was not previously convicted of another capital felony or another felony involving use or threat of violence to the person;
3. The defendant did not knowingly create a grave risk of death to many persons;
4. The Capital offense was committed while the defendant was engaged or was an accomplice to the commission of, or an attempt to commit, or flight after committing or attempting to commit robbery, burglary and kidnapping;
5. The Capital offense was not committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody;
6. The Capital offense was not committed for pecuniary gain;
7. The Capital offense was not committed to disrupt or hinder the lawful exercise *Page 574 
of any governmental function or the enforcement of laws;
8. The Capital offense was especially heinous, atrocious, or cruel compared to other capital offenses.
The Court finds under Section 13A-5-51 as follows:
1. The defendant does not have a significant history of prior criminal activity;
2. The Capital offense was not committed while the defendant was under the influence of extreme mental or emotional disturbance;
3. The victims were not a participant in the defendant's conduct not did they consent thereto;
4. The defendant was an accomplice in the Capital offenses committed with another person and his participation was not relatively minor;
5. The defendant did not act under extreme duress or under the substantial domination of another person;
6. The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was not substantially impaired;
7. The age of the defendant at the time of the crime was 26 years;
The Court finds that there is a mitigating circumstance as defined in Section 13A-5-51(1), as set forth above. The Court has made a diligent search under the provisions of Section13A-5-52, the evidence offered by the defendant, and aspects of presentence report favorable to the defendant on mitigation to determine if there is any aspect of the defendant's character or record or any circumstance of the offense for which he has been convicted that would constitute a mitigating circumstance and finds that the only mitigating circumstance, statutory or non-statutory, is the absence of a prior criminal record.
In considering the aggravating circumstances, as heretofore set forth and enumerated under Section 13A-5-49, the presentence investigation report, the mitigating circumstances, statutory and non-statutory, as heretofore enumerated, the facts of the case at hand, the evidence offered by the defendant, and the jury's recommendation of a death sentence, the Court finds that the aggravating circumstances far outweigh the mitigating circumstances and there is only one logical conclusion as to the defendant's punishment, that conclusion being that he should suffer the punishment of death by electrocution.
So be it, this the 27th day of January, 1984.
 s/Jerry L. Fielding JERRY L. FIELDING CIRCUIT JUDGE