BASCHAB, Presiding Judge.
 

 The appellant, Ellis Louis Mashburn, Jr., pled guilty to and was convicted of five counts of capital murder for the killings of Clara Eva Birmingham (“Eva”) and Henry Owen Birmingham, Jr. (“Henry”). Count I charged him with the robbery-murder of Henry,
 
 see
 
 § 13A-5-40(a)(2), Ala.Code 1975; Count II charged him with the robbery-murder of Eva,
 
 see
 
 § 13A-5^40(a)(2), Ala.Code 1975; Count III charged him
 
 *456
 
 with the burglary-murder of Henry,
 
 see
 
 § 13A-5-40(a)(4), Ala.Code 1975; Count IV charged him with the burglary-murder of Eva,
 
 see
 
 § 13A-5-40(a)(4), Ala.Code 1975; and Count V charged him with murder made capital because he killed Henry and Eva by one act or pursuant to one scheme or course of conduct,
 
 see
 
 § 13A-5-40(a)(10), Ala.Code 1975. The trial court engaged the appellant in a thorough colloquy, as required by
 
 Boykin v. Alabama,
 
 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), and Rule 14.4, Ala. R.Crim. P., during which the appellant admitted his guilt and expressed his desire to enter a guilty plea. The appellant entered his guilty plea, and the matter was presented to a jury so the jury could determine whether the State had proven its case against the appellant beyond a reasonable doubt, as required by § 13A-5-42, Ala. Code 1975. After the jury returned a verdict of guilty, the penalty phase proceedings began. By a vote of eleven to one, the jury recommended that the appellant be sentenced to death. The trial court accepted the jury’s recommendation and sentenced the appellant to death. The appellant filed a motion for a new trial, which was denied by operation of law.
 
 See
 
 Rule 24.4, Ala. R.Crim. P. This appeal followed.
 

 We have reviewed the proceedings before and during the guilt phase of the trial for jurisdictional errors.
 
 See
 
 § 13A-5-42, Ala.Code 1975. Further, we have reviewed the penalty phase proceedings for any error, whether preserved or plain, as required by Rule 45A, Ala. R.App. P., which provides:
 

 “In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review ... whenever such error has or probably has adversely affected the substantial right of the appellant.”
 

 In
 
 Haney v. State,
 
 603 So.2d 368, 392 (Ala.Crim.App.1991), aff'd, 603 So.2d 412 (Ala.1992), we stated:
 

 “The Alabama Supreme Court has adopted federal case law defining plain error, holding that ‘ “[pjlain error” only arises if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings,’
 
 Ex parte Womack,
 
 435 So.2d 766, 769 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983) (quoting
 
 United States v. Chaney,
 
 662 F.2d 1148, 1152 (5th Cir.1981)).”
 

 “[This] plain-error exception to the contemporaneous-objection rule is to be ‘used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.’ ”
 
 United States v. Young,
 
 470 U.S. 1, 15,105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting
 
 United States v. Frady,
 
 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 n. 14 (1982)).
 

 The appellant does not challenge the sufficiency of the evidence to support his convictions. However, we have reviewed the evidence, and we find that it is sufficient to support the convictions. The following facts may be helpful to an understanding of this case:
 

 On October 30, 2002, family members discovered that Henry and Eva had been murdered in their home in Alexandria. The autopsy revealed that they died as a result of multiple blunt and sharp force injuries. There were spatters and pools of blood in the house, and the condition of the scene indicated that there had been a struggle. Blood that matched the appellant’s blood type was located in the victims’ house. Finally, law enforcement officers retrieved various pieces of Eva’s jewelry from the appellant’s residence, from Jeremy Butler’s vehicle and one of Butler’s
 
 *457
 
 friends, and from Tony Brooks’ girlfriend and mother.
 

 Michael Simpson, the appellant’s cellmate at the Calhoun County Jail, testified that the appellant said that he and Brooks used Butler’s vehicle; that they drove to the victims’ house; and that they attacked the victims with a hatchet and a knife.
 

 I.
 

 The appellant argues that the trial court erroneously denied his motion pursuant to
 
 Batson v.
 
 Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), after the State used eight of its forty peremptory strikes to remove black veniremembers. The State argues that the appellant’s “guilty plea waived his right to raise this issue on appeal.” (Appellant’s brief at p. 12.) We addressed a similar situation in
 
 Key v. State,
 
 891 So.2d 353, 371 (Ala.Crim.App.2002), as follows:
 

 “Key’s guilty plea waived this nonjuris-dictional claim from review as it relates to the guilt phase. Because the same jury heard the penalty phase of the proceeding, we will review the claim on appeal as it relates to that phase of the trial.”
 

 Similarly, we will review the appellant’s
 
 Batson
 
 argument as it relates to the penalty phase of his trial.
 

 After the jury was struck but before it was sworn, the following occurred:
 

 “[DEFENSE COUNSEL]: ... [W]e would like to make a
 
 Batson
 
 challenge to sevéral of the strikes that were made. My co-counsel is gathering a list. Because of the amount of information involved and the number involved, we are just having a little bit of trouble. We are pursuing that right now. Your Hon- or—
 

 “THE COURT: Let’s go on the record, please.
 

 “[DEFENSE COUNSEL]: Your Honor, again, trying to accumulate these notes, and according to the notes I’ve been handed and the things we’ve looked at, we want to make a
 
 Batson
 
 challenge based on the State’s conclusion of number 1, number 12, number 13, number 21, number 24—
 

 “THE COURT: Wait, one what?
 

 “[DEFENSE COUNSEL]: 1, 12, 13, 21, 24, 31, 63, and 117, 117. Your Hon- or, all these people that the State chose to strike share one thing primarily in common and that is that they are African American individuals, and when you look at a breakdown of the State’s pattern and practice of strikes in this case, it appears that they left similarly situated individuals on the jury panel that had the same characteristics, and according to my precursory look, the responses or the — their demeanor during questioning was no different than white jury members that were left on the panel who are, and I don’t want to say similarly situated because, again, it’s not an exact same situation, but they are similarly situated. And based on those, we feel the State has exercised a pattern of practice of excluding blacks from this jury panel simply because of their race.
 

 [[Image here]]
 

 “[THE COURT:] Now, your argument is what, please?
 

 “[DEFENSE COUNSEL]: Your Honor, we feel that the State, using the strikes, used them in a discriminatory manner in that the specific strikes of these black people who they did not strike or left on other non black people who shared the same or similar characteristics.
 

 “THE COURT: What are those same or similar characteristics?
 

 “[DEFENSE COUNSEL]: For instance, age, if you look at the ages of the
 
 *458
 
 individuals that were struck, there are similarly situated individuals left on the panel that are not struck at all. As far as responses, there’s people that were ambivalent on the death penalty issue that were white that were not struck by the State, but when it comes time to striking the black people, the people that had the same or similar responses regarding the death penalty were struck, so that leads me to the obvious conclusion that because there are people that are similarly situated that were not struck and similarly situated people that were struck, I have to look for what these people had in common. And clearly to me, in this case, to make sure the record is appropriately protected, we feel that the common thing that these people have in common is their race and the State has exercised a pattern and practice of striking black jurors based simply on their race.
 

 “THE COURT: Two issues are age and response to questions regarding attitude on capital punishment.
 

 “[DEFENSE COUNSEL]: In a rush, that’s the best I could come up with, Your Honor, but that’s what we believe makes them similarly situated, except for their race.
 

 “THE COURT: Well, first of all, as an observation that has been previously made, not only by me, but I know by Judge Street on two formal rulings, our District Attorney’s office has gone out of its way not to exercise State strikes in a discriminatory manner based on race, gender, ethnicity, nor any other arbitrary factor. The defense has a burden of carrying a showing of discriminatory practice; in fact, the Court has to find a prima facie showing. I’m not asking the State to give me reasons at this point, but does the State have any argument in regard to what we just argued?
 

 “[PROSECUTOR]: Judge, if we could just have a second. Judge, I know this is not your question—
 

 “THE COURT: Well, let me ask one other question too. I know that as a matter of practice, the defense bar searches jury lists, any other outside source of information they have available to them; District Attorney’s office searches its own files, searches the various information services that are available to law enforcement and the prosecution. So I guess at this point, do you have anything you want to put into the record that does not appear of record at this time that you have available to you that you wish to show as to why perhaps some of these individuals were struck that would not otherwise appear of record.
 

 “[PROSECUTOR]: Judge, for purposes of having a perfectly clear record, I would state to the Court that our reasons for striking these individuals that have been mentioned is for reasons that were stated in their questionnaires, and I’m prepared to offer that to the Court at this time, why we have struck this group of people.
 

 “THE COURT: All right—
 

 “[PROSECUTOR]: Further, I would state that every other person regardless of race that answered in such a way was also struck, and I’m perfectly confident of that, so.
 

 “THE COURT: If you want to offer that, that’s fine.
 

 “[PROSECUTOR]: Yes, sir.
 

 “THE COURT: Of course, you understand that I have not made a prima facie showing.
 

 “[PROSECUTOR]: Judge, I understand that. And my concern would be that I don’t think they can argue anything at this point that rises to the level of meeting that prima facie burden. I
 
 *459
 
 don’t think I’m required to give race neutral reasons unless that burden is met. My concern is if we are able to convict this young man and he is a recipient of either the death penalty or life without, I don’t want any ambiguity as to why I struck these people.
 

 “THE COURT: Do you understand it will be subject to appellate review because it will be the same as if I found a prima facie showing?
 

 “[PROSECUTOR]: Judge, under those — if that’s the circumstance, then, no, we do not want to offer them unless a prima facie showing has been made, and I don’t believe it has. Judge, I don’t — again, I don’t see a problem offering race neutral reasons without admitting a prima facie showing has been made.
 

 “THE COURT: That’s fine. If you want to do that, go right ahead.
 

 “[PROSECUTOR]: Judge, for the record, I would object that a prima facie showing has not been made, but for purposes of clarification, on juror number 1, which would be [L.A.], page 16 of her questionnaire, she answers that she is not sure if she is in favor of the death penalty and she is not sure if she is opposed.
 

 “Juror number 12, [R.B.], page 16 also, she answers that she is not sure if she’s in favor, and she’s not sure if she’s opposed.
 

 “Number 13, [B.B.], on page 16 of his questionnaire answers that she (sic) is not sure if she (sic) is in favor of the death penalty and answers yes, she (sic) is opposed.
 

 “Number 21, [K.M.], on page 16 of the questionnaire answers it depends on whether she is in favor of the death penalty and she’s not sure if she’s opposed.
 

 “Juror number 24, [B.C.], on page 16, he argues that it depends on whether he’s in favor of the death penalty and, yes, that he is opposed to the death penalty. ■
 

 “Juror number 31, [L.C.], on page 16 of the questionnaire, answers that no, he is not in favor of the death penalty, and, yes, he is opposed and goes on to say that T don’t think it is fair to certain groups.’
 

 “Juror number 63, [W.D.J.], on page 16 of his questionnaire states that he is — it depends on whether he’s in favor, but he is not sure if he’s opposed.
 

 “Juror number 117 is [C.T.], on page 16 of her questionnaire, she says it depends on the particular facts of the case as to whether she’s in favor, but she’s not sure if she’s opposed, and then she goes on to say that it’s used too seldom, and just for comparative purposes, I will tell the Court that we struck everybody else with ambiguous answers of that kind. If they said they are not sure or they are directly opposed and then came into court on individual sequestered voir dire and said something different, that they have no opinion, specifically [L.C.] who said he was opposed, then came into court and said he had no strong opinions either way, those ambiguous questions as to the key question in this case, whether you can apply the death penalty are the reason these individuals were struck.
 

 “Members of other races were struck for that exact same reason, and there’s not anybody that made it through that had ambiguous answers. For instance, I’ll cite juror number 4, [D.A.], that for all other reasons would be a fine juror, he marks originally yes and no, scratches both of those out, writes depends on whether he’s in favor of the death penalty, and then marks he is not sure if he’s
 
 *460
 
 opposed. That ambiguity gave us pause in selecting these individuals.
 

 “So, again, I, on the record, make an objection as to their showing of prima facie but would say for explanation purposes to the Court that there was a race neutral reason for each of those individuals and they vary in ages and every one like them was struck for that reason, everybody that answered ambiguously as to the death penalty.
 

 [[Image here]]
 

 “THE COURT: Okay. I did not detect, still do not detect, anything that would rise to a prima facie showing. The State has offered those. Let those be a part of the record.
 

 “Even though Alabama has early on rejected a mathematical consideration, it may have been a little change in attitude on there, there certainly has been a change of attitude amongst the Federal courts. I do note that we have a jury of 14 persons right now, and I believe three of those individuals are black. That ratio, if ratios are ever to be considered now or later, that ratio far exceeds the number of minority jurors that are available for jury service. That’s another, even though it’s not part of my ruling, that is a factor that certainly needs to be observed.
 

 “Your
 
 Batson
 
 motion is denied.”
 

 (R. 875-87.)
 

 A.
 

 “In
 
 Batson
 
 the United States Supreme Court held that black venire-members could not be struck from a black defendant’s jury because of their race. In
 
 Powers v. Ohio,
 
 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), the court extended its decision in
 
 Batson
 
 to apply also to white defendants. ... The United States Supreme Court in
 
 Georgia v. McCollum,
 
 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), held that the protections of
 
 Batson
 
 were also available to defense counsel in criminal trials. The Alabama Supreme Court has held that the protections of
 
 Batson
 
 apply to the striking of white prospective jurors.
 
 White Consolidated Industries, Inc. v. American Liberty Insurance, Co.,
 
 617 So.2d 657 (Ala.1993).”
 

 Grimsley v. State,
 
 678 So.2d 1194, 1195 (Ala.Crim.App.1995).
 

 “After the appellant makes a timely
 
 Bat-son
 
 motion and establishes a prima facie showing of discrimination, the burden shifts to the state to provide a race-neutral reason for each strike .... See, e.g.,
 
 Ex parte Bird,
 
 594 So.2d 676 (Ala.1991). We will reverse the circuit court’s ruling on the
 
 Batson
 
 motion only if it is ‘clearly erroneous.’
 
 Jackson v. State,
 
 549 So.2d 616 (Ala.Cr.App.1989).”
 

 Cooper v. State,
 
 611 So.2d 460, 463 (Ala.Crim.App.1992).
 

 “Once the prosecutor has articulated a nondiscriminatory reason for challenging the black jurors, the other side can offer evidence showing that the reasons or explanations are merely a sham or pretext.
 
 [People v.] Wheeler,
 
 22 Cal.3d [258] at 282, 583 P.2d [748] at 763-64, 148 Cal.Rptr. [890] at 906 [(1978)]. Other than reasons that are obviously contrived, the following are illustrative of the types of evidence that can be used to show sham or pretext:
 

 “1. The reasons given are not related to the facts of the case.
 

 “2. There was a lack of questioning to the challenged juror, or a lack of meaningful questions.
 

 “3. Disparate treatment — persons with the same or similar characteristics as the challenged juror were not struck. ...
 

 
 *461
 
 “4. Disparate examination of members of the venire; e.g., a question designed to provoke a certain response that is likely to disqualify the juror was asked to black jurors, but not to white jurors. ...
 

 “5. The prosecutor, having 6 peremptory challenges, used 2 to remove the only 2 blacks remaining on the venire. ...
 

 “6. ‘[A]n explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically.’
 
 Slappy [v. State],
 
 503 So.2d [350] at 355 [ (Fla.Dist.Ct.App.1987) ]. For instance, an assumption that teachers as a class are too liberal, without any specific questions having been directed to the panel or the individual juror showing the potentially liberal nature of the challenged juror.”
 

 Ex parte Branch,
 
 526 So.2d 609, 624 (Ala.1987).
 

 In this case, the defense based its
 
 Batson
 
 motion solely on the number of black veniremembers the prosecution struck.
 

 “Alabama courts have recently held that even a showing that [a] party had ... a high percentage of strikes used against a minority was not alone enough. In
 
 Ex parte Trawick,
 
 698 So.2d 162, 168 (Ala.1997), the Alabama Supreme Court held, ‘Without more, we do not find that the number of strikes this prosecutor used to remove women from the venire is sufficient to establish a prima facie case of gender discrimination.’ ”
 

 Armstrong v. State,
 
 710 So.2d 531, 533 (Ala.Crim.App.1997). Based on the defense’s argument, we question whether it established a prima facie showing that the prosecutor exercised his peremptory challenges in a discriminatory manner. Nevertheless, because the prosecutor stated his reasons for his peremptory strikes, we will review those reasons and the trial court’s ruling on the
 
 Batson
 
 motion without determining whether the defense made a prima facie case of discrimination.
 
 See Harris v. State,
 
 705 So.2d 542 (Ala.Crim.App.1997).
 

 The prosecutor stated that he struck the challenged veniremembers based on their ambiguous answers to questions regarding the imposition of the death penalty or based on their opposition to the death penalty.
 

 “ ‘Although a juror’s reservations about the death penalty may not be sufficient for a challenge for cause, his view may constitute a reasonable explanation for the exercise of a peremptory strike.’
 
 Johnson v. State,
 
 620 So.2d 679, 696 (Ala.Cr.App.1992), reversed on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993).”
 

 Dallas v. State,
 
 711 So.2d 1101, 1104 (Ala.Crim.App.1997), aff'd, 711 So.2d 1114 (Ala.1998). Therefore, the prosecutor’s reasons for the strikes were race-neutral.
 

 B.
 

 The appellant also argues that the State’s reasons for its strikes were pretex-tual. We question whether he properly presented- this argument to the trial court. Nevertheless, we have carefully examined the transcript of the voir dire proceedings and the questionnaires the veniremembers completed. The record does not establish that the prosecution engaged in disparate questioning or disparate treatment of similarly situated black and white venire-members.
 
 Cf. Miller-El v. Dretke,
 
 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). Also, with regard to some of the veniremembers, additional questioning by the prosecution was not necessary because
 
 *462
 
 of the answers they had given on their questionnaires or because the trial court had previously questioned them about their feelings concerning the death penalty. The prosecution used its third, seventh, twelfth, fifteenth, eighteenth, twenty-first, twenty-fourth, and thirtieth strikes to remove black veniremembers. As the prosecutor explained, he struck both black and white veniremembers who indicated that they were not sure whether they were in favor of or opposed to the death penalty. Finally, none of the veniremembers who indicated that they were not sure about their feelings about the death penalty served on the jury. Accordingly, we conclude that the State’s reasons for its strikes were not pretextual.
 

 C.
 

 The appellant further appears to argue that his attorneys did not have sufficient time to prepare their
 
 Batson
 
 objection. Because he did not present this argument to the trial court, we review it only for plain error.
 
 See
 
 Rule 45A, Ala. R.App. P.
 

 The appellant makes several references to his attorneys being rushed to make their
 
 Batson
 
 objection. However, the record does not support such a bare assertion. The record shows that the veniremembers filled out extensive questionnaires on Thursday, September 7, 2006, and Friday, September 8, 2006; that the parties thoroughly questioned the veniremembers both in groups and individually on Monday, September 11, 2006, and Tuesday, September 12, 2006; and that the parties struck the jury and the defense made its
 
 Batson
 
 motion on the morning of Wednesday, September 13, 2006. Based on our review of the jury selection process, we do not find that there was any plain error in this regard.
 

 II.
 

 The appellant also argues that “[t]he failure of the trial judge to instruct [him] on the right to withdraw his guilty plea within thirty days of its entry, void[ed] the plea and thereby diminish[ed] the evidence presented to the jury to such a degree as to render their verdict improper.”
 

 (Appellant’s brief at p. 59.) With regard to guilty pleas in capital cases, § 13A-5-42, Ala.Code 1975, provides:
 

 “A defendant who is indicted for a capital offense may plead guilty to it, but the state must in any event prove the defendant’s guilt of the capital offense beyond a reasonable doubt to a jury. The guilty plea may be considered in determining whether the state has met that burden of proof. The guilty plea shall have the effect of waiving all non-jurisdictional defects in the proceeding resulting in the conviction except the sufficiency of the evidence. A defendant convicted of a capital offense after pleading guilty to it shall be sentenced according to the provisions of Section 13A-5 — 43(d).”
 

 Also, with regard to the acceptance of guilty pleas generally, Rule 14.4(a), Ala. R.Crim. P., provides, in pertinent part:
 

 “[T]he court shall not accept a plea of guilty without first addressing the defendant personally in the presence of counsel in open court for the purposes of:
 

 “(1) Ascertaining that the defendant has a full understanding of what a plea of guilty means and its consequences, by informing the defendant of and determining that the defendant understands:
 

 “(i) The nature of the charge and the material elements of the offense to which the plea is offered;
 

 
 *463
 
 “(ü) The mandatory minimum penalty, if any, and the maximum possible penalty provided by law, including any enhanced sentencing provisions;
 

 “(iii) If applicable, the fact that the sentence may run consecutively to or concurrently with another sentence or sentences;
 

 “(iv) The fact that the defendant has the right to plead not guilty, not guilty by reason of mental disease or defect, or both not guilty and not guilty by reason of mental disease or defect, and to persist in such a plea if it has already been made, or to plead guilty;
 

 “(v) The fact that the defendant has the right to remain silent and may not be compelled to testify or give evidence against himself or herself, but has the right, if the defendant wishes to do so, to testify on his or her behalf;
 

 “(vi) The fact that, by entering a plea of guilty, the defendant waives the right to trial by jury, the right to confront witnesses against him or her, the right to cross-examine witnesses or have them cross-examined in defendant’s presence, the right to testify and present evidence and witnesses on the defendant’s own behalf, and the right to have the aid of compulsory process in securing the attendance of witnesses;
 

 “(vii) The fact that, if the plea of guilty is accepted by the court, there will not be a further trial on the issue of defendant’s guilt; and
 

 “(viii) The fact that there is no right to appeal unless the defendant has, before entering the plea of guilty, expressly reserved the right to appeal with respect to a particular issue or issues, in which event appellate review shall be limited to a determination of the issue or issues so reserved; and
 

 “(2) Determining that the plea is voluntary and not the result of force, threats, or coercion, nor of any promise apart from the plea agreement that has been disclosed to the court as provided in Rule 14.3(b); and
 

 “(3) Giving the defendant an opportunity to state any objections he or she may have to defense counsel or to the manner in which defense counsel has conducted or is conducting the defense.”
 

 Neither § 13A-5-42, Ala.Code 1975, nor Rule 14.4(a), Ala. R.Crim. P., provides that a defendant who enters a guilty plea has
 
 a right
 
 to withdraw that plea. Rather, with regard to withdrawal of guilty pleas, Rule 14.4(e), Ala. R.Crim. P., provides, in pertinent part:
 

 “The court shall allow withdrawal of a plea of guilty when necessary to correct a manifest injustice.”
 

 Also, “[w]hether a defendant should be allowed to withdraw a plea of guilty is a matter solely within the discretion of the trial court, whose decision will not be disturbed on appeal absent a showing of abuse of that discretion.”
 
 Alford v. State,
 
 651 So.2d 1109, 1112 (Ala.Crim.App.1994). Therefore, the appellant’s argument about the validity of his guilty plea is without merit.
 
 [1]
 

 
 *464
 
 III.
 

 The appellant further argues that “the lack of viable mitigation specialists in the State of Alabama violate[s his] due process right to adequately defend his right to life under the Fifth and Fourteenth Amendments] to the Constitution.” (Appellant’s brief at p. 63.) The following timeline is relevant to an understanding of this argument:
 

 May 13, 2003 The trial court appointed trial counsel.
 

 July 13, 2004 The defense filed a motion for a mental evaluation and a motion for approval of expenses for a forensic investigator.
 

 March 17, 2005 The trial court ordered that the appellant undergo a mental evaluation.
 

 June 29, 2005 The defense filed an ex parte motion for funds to hire Lucia Pen-land as a mitigation expert.
 

 July 14, 2005 The trial court ordered the defense to submit documentation showing the qualifications of its proposed mitigation expert.
 

 July 26, 2005 The defense filed a amended ex parte motion for funds to hire Lucia Penland as a mitigation expert.
 

 August 8, 2005 The trial court approved the defense’s request for funds to hire Lucia Penland as a mitigation expert.
 

 October 14, 2005 The defense filed an ex parte request for funds to hire JoAnne Terrell as a mitigation expert.
 

 November 30, 2005 The trial court approved the defense’s request for funds to hire JoAnne Terrell as a mitigation expert.
 

 January 12,2006 The defense filed a motion to continue the trial, which was set for February 21, 2006. In the motion, the defense asserted it had had to terminate Penland’s services; that it had only recently retained Terrell as a mitigation expert; and that Terrell had stated that she needed a continuance so she could conduct an adequate mitigation investigation.
 

 January 13, 2006 The trial court conducted a hearing on the motion to continue. During the hearing, the defense explained that Penland originally had a staff, but was eventually working from her home, and that it changed experts to Terrell because Penland had not investigated the case. It then explained that Terrell had stated that she could not be ready for trial by February 21, 2006.
 

 January 16, 2006 The trial court denied the motion to continue, but granted additional money to help Terrell expedite her investigation.
 

 January 17,2006 The defense filed a renewed motion to continue the trial setting. In the motion, the defense asserted that, after learning that the trial court had denied the motion to continue, Terrell had refused to work on the case if the case was not continued. The defense also asserted that it needed more time to locate another mitigation expert and for that expert to perform a mitigation investigation.
 

 January 30, 2006 The trial court continued the trial from February 21, 2006, because Terrell resigned as the defense’s mitigation expert.
 

 April 26, 2006 The trial court entered an order setting the trial for September 11, 2006.
 

 July 11, 2006 The defense filed a “Motion for Approval of Funds for Mitigation Expert and Request for Approval of Additional Funds.”
 

 August 15, 2006 The defense filed a motion for approval of funds for the appellant to have an MRI performed, and the trial court granted the motion.
 

 September 7, 2006 The trial proceedings started.
 

 Clearly, the trial court went to great lengths to facilitate the defense’s mitigation investigation and presentation. Although the defense had difficulties with the first two experts, those difficulties were primarily attributable to the experts themselves. Finally, as a result of the efforts of the third expert, during the penalty phase of the trial, the defense presented extensive testimony regarding the appellant’s social and family history, educational background, medical history, history of alcohol and substance abuse, and mental health history. Therefore, the appellant has not established, and we do not find, a due process violation in this regard.
 

 
 *465
 
 IV.
 

 Finally, the appellant argues that the trial court improperly denied his challenges to the constitutionality of the death penalty.
 

 A.
 

 First, the appellant contends that the death penalty constitutes cruel and unusual punishment. “There is an abundance of caselaw, however, that holds that the death penalty is not per se cruel and unusual punishment.”
 
 Stewart v. State,
 
 730 So.2d 1203, 1242 (Ala.Crim.App.1997) (opinion on third return to remand), aff'd, 730 So.2d 1246 (Ala.1999).
 

 B.
 

 Second, the appellant contends that Alabama’s death penalty statute is unconstitutional because it does not narrow the class of death eligible offenders; because it allegedly gives the trial court arbitrary discretion in the imposition of the death penalty; and because the judge, rather than the jury, ultimately determines the sentence. However, Alabama courts have addressed and rejected these arguments.
 
 See Ex parte Waldrop,
 
 859 So.2d 1181 (Ala.2002);
 
 Lee v. State,
 
 898 So.2d 790 (Ala.Crim.App.2003);
 
 Johnson v. State,
 
 823 So.2d 1 (Ala.Crim.App.2001).
 

 V.
 

 Based on our review of the record, we conclude that the trial court’s written sentencing order does not comply with the requirements of § 13A-5-47(d), Ala.Code 1975, which provides:
 

 “Based upon the evidence presented at trial, the evidence presented during the sentence hearing, and the pre-sentence investigation report and any evidence submitted in connection with it, the trial court shall enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, each mitigating circumstance enumerated in Section 13A-5-51, and any additional mitigating circumstances offered pursuant to Section 13A-5-52.
 

 The trial court shall also enter written findings of facts summarizing the crime and the defendant’s participation in it.”
 

 Although the trial court prepared a “Court’s Independent Review of the Evidence, Sentencing Memorandum and Order Denying New Trial” that partially complied with § 13A-5-47(d), Ala.Code 1975, it entered that order after the appellant’s motion for a new trial was denied by operation of law. Therefore, we remand this case with the instruction that the trial court enter a new sentencing order that complies with the requirements of § 13A-5-47(d), Ala.Code 1975. On remand, the trial court shall take all necessary action to see that the circuit clerk makes due return to this court at the earliest possible time and within 28 days after the release of this opinion.
 

 REMANDED WITH INSTRUCTIONS.
 

 McMILLAN, SHAW, WISE, and WELCH, JJ., concur.
 

 On Return to Remand
 

 BASCHAB, Presiding Judge.
 

 On November 2, 2007, we remanded this case with instructions that the trial court amend its sentencing order to comply with the requirements of § 13A-5-47(d), Ala. Code 1975. On remand, the trial court complied with our instructions. We now address the propriety of the appellant’s convictions and sentence of death.
 

 Pursuant to § 13A-5-53, Ala.Code 1975, we are required to address the propriety of the appellant’s convictions and
 
 *466
 
 sentence of death. The appellant was indicted for and convicted of five counts of capital murder — two counts because he committed the murders during the course of a robbery,
 
 see
 
 § 13A-5-40(a)(2), Ala. Code 1975; two counts because he committed the murders during the course of a burglary,
 
 see
 
 § 13A-5^10(a)(2), Ala.Code 1975; and one count because he committed the murders by one act or pursuant to one scheme or course of conduct,
 
 see
 
 § 13A-5-40(a)(10), Ala.Code 1975.
 

 The record does not reflect that the sentence of death was imposed as the result of the influence of passion, prejudice, or any other arbitrary factor.
 
 See
 
 § 13A-5 — 53(b)(1), Ala.Code 1975.
 

 The trial court found that the aggravating circumstances outweighed the mitigating circumstances. It found that the State proved four aggravating circumstances — 1) the appellant committed the capital offenses while he was engaged in or was an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit, robbery,
 
 see
 
 § 13A-5-49(4), Ala.Code 1975; 2) the appellant committed the capital offenses while he was engaged in or was an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit, a burglary,
 
 see
 
 § 13A-5^49(4), Ala.Code 1975; 3) the capital offenses were especially heinous, atrocious, or cruel compared to other capital offenses,
 
 see
 
 § 13A-5-49(8), Ala.Code 1975; and 4) the appellant intentionally caused the death of two or more people by one act or pursuant to one scheme or course of conduct,
 
 see
 
 § 13A-5-49(9), Ala. Code 1975. The trial court found that two statutory mitigating circumstance existed — 1) the appellant did not have a significant history of prior criminal activity,
 
 see
 
 § 13A-5-51(1), Ala.Code 1975; and 2) the age of the appellant at the time of the offenses,
 
 see
 
 § 13A-5-51(7), Ala.Code 1975. It also made the following findings as to nonstatutory mitigating circumstances:
 

 “1. The Defendant accepted legal responsibility for his conduct by pleading guilty.
 

 [[Image here]]
 

 “4. The Defendant had a stormy and dysfunctional family life and was more probable than not himself the victim of psychological and physical abuse and was not properly protected by his mother from those infra-family problems.
 

 “5. The Defendant had an untreated learning disability (ADD-ADHD) resulting in significant educational behavioral and academic issues.
 

 “6. The Defendant’s psycho-social history indicated a familial predisposition to mental health, social adjustment and/or substance abuse issues with the Defendant himself engaging in substance abuse at an early age and poly-substance abuse at or near the time of the crimes charged.
 

 “7. The Defendant was reported by family members to be the product of a difficult birth and to have been ‘dark’ (anoxic) at delivery. This proffered mitigating circumstance was substantially impeached by the State but is given appropriate consideration by the Court.
 

 “8. The Defendant’s mental health issues that should have been identified and addressed were not. At one point, the Defendant claimed to have heard voices but was presented to a pastor for counseling rather than a mental health professional.
 

 “9. The Defendant is loved by his family.
 

 “10. That life without possibility of parole means life without possibility of parole.
 

 
 *467
 
 [[Image here]]
 

 “The defense offered some evidence, in part by way of inference, that the Defendant suffered some organic brain injury due to an argued anoxic birth and/or suffered head trauma and/or poly-substance abuse, including the sniffing of solvents or products containing solvents which displace oxygen thereby producing an anoxic ‘high.’ The Court gave the defense great latitude in this area and ordered MRIs to be conducted at significant expense to the State in an effort to give the defense a means to establish any organic brain abnormality that might mitigate the Defendant’s behavior. None was ever shown by any reliable degree of proof and, in fact, the Defendant was found to have a structurally normal brain for a male his age. Even so, the Court did consider the fact that developmental issues in an individual may not be capable of being objectively demonstrated by today’s medical science. In addition, there was no reliable evidence of significant retardation of the Defendant.
 

 [[Image here]]
 

 “While neither an aggravating nor controlling circumstance, the Court has considered the Jury’s recommended sentence in this case with specific note being given to the fact that it was not unanimous, the latter circumstance being considered in favor of the Defendant.”
 

 The sentencing order shows that the trial court weighed the aggravating and mitigating circumstances and correctly sentenced the appellant to death. The record supports its decision, and we agree with its findings.
 

 Section 13A-5-53(b)(2), Ala.Code 1975, requires us to weigh the aggravating and mitigating circumstances independently to determine the propriety of the appellant’s sentence of death. After independently weighing the aggravating and mitigating circumstances, we find that the death sentence is appropriate.
 

 As required by § 13A — 5—53(b)(3), Ala. Code 1975, we must determine whether the appellant’s sentence was disproportionate or excessive when compared to the penalty imposed in similar cases. The appellant committed two murders during two robberies and two burglaries and killed two people pursuant to one scheme or course of conduct. Similar crimes are being punished by death throughout this state.
 
 See Gaddy v. State,
 
 698 So.2d 1100 (Ala.Crim.App.1995), aff'd, 698 So.2d 1150 (Ala.1997);
 
 Brooks v. State,
 
 695 So.2d 176 (Ala.Crim.App.1996), aff'd, 695 So.2d 184 (Ala.1997);
 
 Bush v. State,
 
 695 So.2d 70 (Ala.Crim.App.1995), aff'd, 695 So.2d 138 (Ala.1997);
 
 Taylor v. State,
 
 666 So.2d 36 (Ala.Crim.App.), opinion extended after remand, 666 So.2d 71 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995);
 
 Holladay v. State,
 
 549 So.2d 122 (Ala.Crim.App.1988), aff'd, 549 So.2d 135 (Ala.1989);
 
 Siebert v. State,
 
 555 So.2d 772 (Ala.Crim.App.), aff'd, 555 So.2d 780 (Ala.1989);
 
 Peoples v. State,
 
 510 So.2d 554 (Ala.Crim.App.1986), aff'd, 510 So.2d 574 (Ala.1987). Therefore, we find that the sentence was neither disproportionate nor excessive.
 

 Finally, we have searched the entire record for any error that may have adversely affected the appellant’s substantial rights, and we have not found any.
 
 See
 
 Rule 45A, Ala. R.App. P.
 

 Accordingly, we affirm the appellant’s convictions and sentence of death.
 

 AFFIRMED.
 

 McMILLAN, SHAW, WISE, and WELCH, JJ., concur.
 

 [1]
 

 . In connection with this argument, the appellant also asserts that, if we find that his guilty plea was not valid, then we must also conclude that the State did not present sufficient evidence to support his conviction. However, because we find that his guilty plea was valid, it is not necessary to address any additional assertions that are premised on the assumption that his guilty plea was not valid.